RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
KATHERINE TANAKA
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Katherine_Tanaka@fd.org

Attorney for Renato Consuegra-Clemente

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    v.<br><br>RENATO CONSUEGRA-CLEMENTE,<br><br>             Defendant. | Case No. 2:20-cr-00018-JCM-EJY<br><br>**SENTENCING MEMORANDUM AND FORMAL OBJECTIONS TO THE PRESENTENCE REPORT**[1] |

Renato Consuegra-Clemente, through counsel, submits the instant sentencing memorandum for this Court's consideration in fashioning a just sentence. In this case, a sentence of time-served, which amounts to 34 months in federal custody, is "sufficient, but not greater than necessary" to meet the goals of sentencing under 18 U.S.C. § 3553(a).[2]

## I.    BACKGROUND

The government charged Mr. Consuegra and his brother-in-law, Javier Mares, with conspiracy to distribute methamphetamine beginning on a date unknown and extending to October 30, 2019.[3] There were two alleged drug sales—one on October 23, 2019, and one on

---

[1] This sentencing memo is timely filed.

[2] Mr. Consuegra-Clemente was arrested on February 10, 2020, and he has been in continuous federal custody since that date. ECF No. 12.

[3] ECF No. 1.

October 30, 2019.[4]  In March 2022, this Court sentenced Mr. Mares to 96 months in custody for his role in the conspiracy.[5]  For the last almost three years that this case has been pending, Mr. Consuegra has been in custody—separated from his family and fighting to keep himself safe during a global pandemic.  Meanwhile, his brother-in-law, Mr. Mares, remained out of custody, living with his family in the safety of his own home.

Mr. Consuegra had no criminal history prior to this case, aside from a few traffic infractions—a majority of which occurred over a decade before the instant case.[6]  At the time of his arrest, Mr. Consuegra had a home to return to with his wife and children, and he was gainfully employed by Garcia Landscaping Services, while also maintaining his car wash business on the side.[7]  Mr. Consuegra, however, is not a citizen.[8]  Accordingly, unlike his brother-in-law, who will be able to return to his home in Las Vegas, Mr. Consuegra will be further separated from his family and forced to live in a country he has not lived in since he was 14 years old after completing his sentence in this case.[9]  Mr. Consuegra's status as an undocumented individual subject to deportation, combined with his time spent in custody during a global pandemic, will undeniably make his time in custody a hasher experience than that of his brother-in-law and co-defendant, Mr. Mares.

---

[4] *Id.*

[5] ECF No. 79.

[6] PSR at 10-13.  There was one domestic battery charge in 2014, but that was dismissed following successful completion of a pretrial diversion program.

[7] PSR ¶ 86.

[8] PSR at 3.

[9] *See* PSR ¶ 64; *see also* ECF No. 63 at 5 ("Mr. Mares was born in El Paso, Texas. . . .")

Mr. Consuegra has accepted responsibility for his actions in this case, and he certainly does not deny his involvement. But there are clear differences between Mr. Consuegra and Mr. Mares that must be considered in fashioning an appropriate sentence here.

To start, Mr. Consuegra comes before this Court fully accepting responsibility for his actions in this case, without any attempts to explain away his involvement with justifications that are untrue—unlike his co-defendant, Mr. Mares. During Mr. Mares's sentencing before this Court and his post-arrest interview, Mr. Mares claimed that the reason he got involved in the drug sales was because of threats that were being made to his family. At Mr. Mares's post-arrest interview, he claimed that Mr. Consuegra told him "he had been threatened" by an individual named Alonso and that Alonso "threatened to hurt Consuegra-Clemente, his wife, and his children if Consuegra-Clemente did not provide Alonso with 50-100 pounds of methamphetamine every couple of days."[10] Mr. Consuegra denies any of this is true. During his Safety Valve proffer with the government, agents asked Mr. Consuegra if he or his family had been threatened. Mr. Consuegra said no. He has admitted that his involvement in these drug sales was the product of his own poor decisions, not because of any threats to his family.

As to the remaining claims in Mr. Mares's post-arrest interview, United States Probation spoke to case agents and reported the following:[11]

> 29.   Contact was made with the case agents, who verified the above offense conduct. They further added that the statements made by Mares following his arrest were not believable. Considering such, the interview was terminated.

---

[10] PSR ¶ 26.

[11] PSR ¶

3

In Mr. Mares's sentencing memorandum to this Court, he continued to maintain his involvement was driven by threats made to his family—but this time, he brought his sister into the story, claiming she was the person who came to him with the threats.[12]

> The charges in this case stemmed from threats made to Ana, Mr. Mares' sister. . . . Ana relayed to Mr. Mares that if her husband, co-defendant Renato Consuegra-Clemente, did not start selling methamphetamine she would be harmed. *Id.* Renato then asked Mr. Mares to deliver a bag in return for cash. *Id.* Mr. Mares was willing to do so in order to protect his sister and her family. *Id.* Ana (Becky) regrets her decision to get Mr. Mares involved in the drug transactions and wishes she never told Mr. Mares anything about the threats made to her. *Id.* She feels she has caused Mr. Mares to potentially lose everything. *Id.*[13]

As the government explained in its response to Mr. Mares's sentencing memorandum, there is nothing in the record to support the claim that a threat was ever made to Mr. Mares's family "except for the self-serving statements made" by Mr. Mares.[14]  More importantly, as the government argued, "Mr. Mares' actual conduct in this case directly contradicts this unsubstantiated claim that he was forced to commit the crimes."[15]

Unlike Mr. Mares, Mr. Consuegra comes before this Court fully accepting responsibility for his actions without any excuses beyond acknowledging his own poor decision to involve himself in a situation that he believed would help him provide a better life for his family.  Additionally, unlike Mr. Mares, Mr. Consuegra's involvement in this conspiracy is that of a facilitator and not as someone with substantial authority and responsibility.  As United States Probation reported from talking to the case agents here:

---

[12] ECF No. 63 at 6.

[13] *Id.*

[14] ECF No. 76 at 3, n. 3.

[15] *Id.* at 3.

4

30.   Notably, the agents related they initially believed Mares was the individual directly involved with the source of supply. In fact, they believed Mares' ex-wife had family ties to the source of supply. Nevertheless, the agents indicated they have no definitive evidence which demonstrates Mares was the lead to the source of supply, and not his codefendant, **Consuegra-Clemente**. Based upon the amount of methamphetamine involved in the above noted controlled buys and the fact that Mares and **Consuegra-Clemente** preferred to conduct deals involving 20 to 50 pounds of methamphetamine, the agents believe it is highly conceivable Mares had been involved in prior drug transactions, as he was entrusted with a significant amount of methamphetamine.

While there was no "definitive evidence" demonstrating Mr. Mares was the lead to the source of supply, initial investigation suggested that Mr. Mares was the person who had family ties to the source—not Mr. Consuegra. Even the government acknowledged the difference in involvement between Mr. Mares and Mr. Consuegra. As pointed out by the government in its response to Mr. Mares's sentencing memorandum, Mr. Mares actually "conducted the [October 23, 2019] transaction alone."[16] Mr. Consuegra was not present.

The government additionally noted "it was Mares, not his co-defendant, who brought the four pounds of methamphetamine to the deal on October 29, 2019."[17] Mr. Mares and Mr. Consuegra drove in separate cars for this particular meeting with the CS, and Mr. Mares was the person who retrieved the methamphetamine from his red Chevy truck.[18] The record shows that in each of the recorded transactions, it was Mr. Mares who was entrusted with the drugs—not Mr. Consuegra. While Mr. Consuegra certainly had knowledge and relayed communications from the alleged source, that he never had direct possession of any drugs is relevant to his role in this case.

As the government pointed out, "[b]eing entrusted to transport and distribute these large quantities of methamphetamine—drugs that had a street value of $6,500—was likely the

---

[16] *Id.*

[17] *Id.*

[18] PSR ¶¶ 13, 14.

5

result of a relationship built by Mares over the course time with the source of supply."[19]  Mr. Consuegra did not have a similar level of responsibility or access to the drugs.  In addition to possession of the methamphetamine during the actual sales, Mr. Mares, as the government pointed out, was also found with 55 grams of methamphetamine in November 2019 after officers were called out to a domestic disturbance call.[20]  As the government reasoned, these facts "show[] that Mares played a more integral role in acquiring the methamphetamine than he would like the Court to believe."[21]

The record shows that Mr. Mares had possession and control over the methamphetamine; kept in contact with the source of supply—claiming he used "old 'flippy' phones" that he kept "for a very short time" before "throw[ing] them away"[22]; and was responsible for very specific details during the drug transactions, including packaging of the drugs—asking if the CS "preferred Starbucks or candles for packaging on future narcotics transactions."[23]  While Mr. Consuegra communicated with the CS to set up drug sales and had knowledge about the source of supply, that was the extent of his role.  The record shows he assisted the operation by relaying information, answering questions, collecting money on one occasion, and helping to set up sales.  He did not have direct access or possession to the methamphetamine.  While not insignificant, these distinctions are relevant to determining the appropriate sentence in this case.

---

[19] ECF No. 76 at 3-4.

[20] *Id.* at 4.

[21] *Id.* at 3.

[22] PSR ¶ 8.

[23] PSR ¶ 14.

## II.    ARGUMENT

### A.    Mr. Consuegra should receive a minor role reduction.

As currently calculated in the PSR based on the amount of methamphetamine, Mr. Consuegra's sentencing guideline range is **108-135 months**.[24]  He is in Criminal History Category I, and he is safety valve eligible.[25]

| | |
|---|---|
| **Base Offense Level:  § 2D1.1(c)(1)** | **36** |
| **Safety Valve:  § 2D1.1(b)(18)** | -2 |
| **Acceptance of Responsibility** | -3 |
| **Total Offense Level** | **31** |

Based on Mr. Consuegra's role in this case, however, this Court should consider a mitigating role reduction.  Specifically, this Court should find Mr. Consuegra is eligible for a two-level adjustment as a minor participant under U.S.S.G. § 3B1.2.  Applying this adjustment brings Mr. Consuegra's guideline range down to **63-78 months** and produces the total offense level below:

| | |
|---|---|
| **Base Offense Level:  § 2D1.1(a)(5)(ii)** | **33** |
| **Safety Valve:  § 2D1.1(b)(18)** | -2 |
| **Minor Role:  § 3B1.2(b)** | -2 |
| **Acceptance of Responsibility** | -3 |
| **Total Offense Level** | **26** |

---

[24] PSR at 21.

[25] PSR at 9, 21.

7

"The Sentencing Guidelines provide district courts with tools for distinguishing among individuals who commit the same crime but have different levels of relative culpability." *United States v. Rodriguez*, 44 F.4th 1229, 1232 (9th Cir. 2022). To be eligible for the two-level minor role adjustment, "a defendant must be less culpable than most other participants in the criminal activity, U.S.S.G. § 3B1.2(b), cmt. 5, and substantially less culpable than the average participant in the criminal activity, *id.* at cmt. 3(A)." *Id.* at 1232–33 (cleaned up). "The relevant comparison is to the other participants in the defendant's crime, not to typical defendants who commit similar crimes." *United States v. Dominguez-Caicedo*, 40 F.4th 938, 960 (9th Cir. 2022).

Prior to 2015, the Sentencing Commission found that the mitigating-role guideline "was being applied inconsistently and more sparingly than the Commission intended." *Rodriguez*, 44 F.4th at 1233. "To remedy this problem, the Sentencing Commission amended the commentary to induce district courts to grant mitigating-role adjustments more frequently"—most importantly by introducing five factors district courts must consider when determining whether to apply an adjustment:

(i)    the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)   the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)  the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)   the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)    the degree to which the defendant stood to benefit from the criminal activity.

1    *Id.* (citing U.S.S.G. § 3B1.2 cmt. 3(C)).

2        "To determine whether a defendant is substantially less culpable than the average

3    participant in the offense, a district court must proceed in three steps." *Dominguez-Caicedo*,

4    40 F.4th at 960. First, the court must identify all of the individuals for whom there is

5    sufficient evidence of their existence and participation in the overall scheme. *Id.* Second, the

6    court must calculate a rough average level of culpability for these individuals, taking into

7    consideration the five factors in comment 3(C) to the Mitigating Role Guideline. *Id.* Third,

8    the court must compare the defendant's culpability to that average. If the defendant is

9    substantially less culpable than that average and meets the other criteria, he should be granted

10   a mitigating role adjustment. *Id.*

11       In applying this analysis, the Ninth Circuit held that "each co-participant's culpability

12   affects the minor role analysis." *Rodriguez*, 44 F.4th at 1234. Specifically, when evaluating

13   whether Mr. Consuegra is less culpable than the average participant, this Court must consider

14   "*all* likely participants in the criminal scheme." *Id.; Dominguez-Caicedo*, 40 F.4th at 960.

15   "[T]he touchstone of a § 3B1.2 adjustment is the defendant's relative culpability." *United*

16   *States v. Demers*, 13 F.3d 1381, 1384 (9th Cir. 1994).

17       Importantly, "even a defendant who knows some of the scope and structure of the

18   organization, participates in some of the planning, and receives a large payment for his

19   participation could still play a relatively minor role compared to his co-participants if they

20   know more about the scope and structure of the organization, are more heavily involved of the

21   planning, and receive a larger share of the proceeds." *Rodriguez*, 44 F.4th at 1235. "The key

22   question is how the defendant compares with the other participants in the offense." *Id.*

23       Here, there are at least three individuals for the Court to consider: (1) Mr. Consuegra,

24   (2) Mr. Mares, and (3) the source of supply. Considering each of the three individuals and the

25   five factors in U.S.S.G. § 3B1.2 cmt. 3(C), the record supports applying a minor role

26   reduction for Mr. Consuegra.

**1.    The degree to which the defendant understood the scope and structure of the criminal activity.**

The record shows that, just like Mr. Mares, Mr. Consuegra was familiar with the price of the drugs, the amount of drugs that could be provided, the source of supply's sale preferences, and the general location of the source of supply.[26]  Based on the record, Mr. Consuegra did not have any more knowledge and understanding of the scope and structure of the drug sales than Mr. Mares or the source of supply.

**2.    The degree to which the defendant participated in planning or organizing the criminal activity and the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority.**

The record shows that, just like Mr. Mares, Mr. Consuegra was able to help coordinate sales.  Mr. Consuegra relayed the prices and preferred amounts of sale from the source of supply—but Mr. Consuegra did not demonstrate any decision-making or negotiating authority.[27]  Mr. Consuegra helped relay information and set up sales, but, unlike Mr. Mares, he never had direct access or possession of the methamphetamine.

**3.    The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts.**

While Mr. Consuegra had basic knowledge regarding the price per pound of the drugs and was able to assist in communicating and coordinating sales, his actual participation in the possession and transfer of methamphetamine was substantially less than that of Mr. Mares. As the government emphasized, Mr. Mares conducted the October 23, 2019 methamphetamine sale alone, without Mr. Consuegra, and "made several comments regarding his ability to get drugs and his tactics to avoid detection by police"—specifically by

---

[26] *See*  PSR at 5-7.

[27] *See id.*

10

referencing his use of flip phones to avoid keeping the same number for very long.[28]  The government also noted that it was Mr. Mares who brought the methamphetamine to the October 29, 2019 sale.[29]  While Mr. Consuegra was present for the transaction—arriving in his own car, it was Mr. Mares who had the methamphetamine in his red Chevy truck.[30]  In both the sales, Mr. Mares had very specific knowledge and involvement in the sales—specifically noting that there was extra weight put in the box during the October 24 sale "to make sure it was fair" and asking the CS what sort of packaging he preferred for future sales (Starbucks boxes or candles).[31]

As the government pointed out, the fact that Mr. Mares was entrusted with such large quantities of methamphetamine shows that he had likely established a relationship with his source of supply over a course of time.[32]  Mr. Consuegra never had possession of any of the actual drugs during the sales, and unlike, Mr. Mares, no drugs were ever found on Mr. Consuegra or in his possession.[33]  And while case agents claimed they did not have any "definitive evidence" demonstrating Mr. Mares was the lead to the source of the supply, they believed Mr. Mares "was the individual directly involved with the source of supply" and believed he "had family ties to the source of supply."[34]  There was no similar alleged ties or belief as it pertained to Mr. Consuegra.

Comparing Mr. Mares's actions in this case to Mr. Consuegra's, the record shows Mr. Mares had substantially more responsibility and involvement than Mr. Consuegra.

---

[28] ECF No. 76 at 3.

[29] *Id.*

[30] PSR ¶ 14.

[31] PSR ¶¶ 8, 14.

[32] ECF No. 76 at 3-4.

[33] *See id.* at 4.

[34] PSR ¶ 30.

4.    **The degree to which the defendant stood to benefit from the criminal activity.**

The only exchange of money that Mr. Consuegra was ever present for was the $1600 he received from the CS from the October 29, 2019 sale.[35]  Notably, however, that $1600 was payment for the methamphetamine that Mr. Mares brought.[36]  There is nothing in the record to establish that Mr. Consuegra ever actually benefitted or saw any money from the sales.

\* \* \*

Considering each of these factors, the record shows that Mr. Mares had a long-established relationship with the source of supply, as he was the only person ever entrusted with the actual possession and transfer of the methamphetamine.  While Mr. Consuegra assisted in communicating and setting up sales, he was not trusted with any responsibility beyond that.  Compared to Mr. Mares and the source of supply, Mr. Consuegra's involvement was substantially less, and therefore, this Court should find Mr. Consuegra eligible for the mitigating role reduction.

B.    **A downward variance is appropriate in this case considering Mr. Consuegra's circumstances.**

Even if this Court does not apply the mitigating role reduction, a variance is appropriate in this case considering the nature and circumstances of the offense outlined above, Mr. Consuegra's background and characteristics, and the uniquely harsh conditions under which Mr. Consuegra is serving his sentence.

Mr. Consuegra has accepted responsibility for his actions in this case.  Driven by the desire to provide a better life for his family and to avoid losing the car wash business he worked so hard to build, Mr. Consuegra made the terrible decision to get involved helping to sell methamphetamine.  It is a decision that he regrets every day, and he has spent the last

---

[35] PSR ¶¶ 16-17.

[36] PSR ¶¶ 16-17.

12

three years trying to make up for that decision—focusing on his rehabilitation and figuring out what his new future will look like once this chapter is behind him—how he is going to support himself while in Mexico and, most importantly, how he will be able to support his daughters from afar.  While in custody at NSDC, he has taken every possible rehabilitative class available to him—including job readiness, healthy coping skills, family and community reunification, basic education, and behavior change.[37]  As soon as he was able, Mr. Consuegra also applied for and began working in NSDC's Volunteer Work Program, where he spends at least 48 hours every week working in the kitchen.[38]



Prior to this case, Mr. Consuegra was a hard-working husband and father, who worked for the same landscaping business for over 17 years.[39]  His boss, Mario Garcia, described Mr. Consuegra as a man with an excellent work ethic and a reliable employee.[40]  For the 26 years that Mr. Consuegra has lived in this country he has never had any criminal convictions, beyond a few traffic violations.[41]  As a first time offender who has already spent the last three years focused on his rehabilitation and future plans, additional time in custody is not necessary to meet the goals of sentencing.

---

[37] *See* Exhibit A.

[38] Exhibit B.

[39] PSR ¶ 86.

[40] *See* Exhibit C.

[41] PSR at 10-13.

A variance in this case is additionally warranted in light of the circumstances under which Mr. Consuegra has been serving his sentence and will continue to serve his sentence. Unlike Mr. Mares, Mr. Consuegra will have served a portion of his sentence during a global pandemic. While Mr. Mares was able to remain with his family safe at home during the height of COVID, Mr. Consuegra endured the entire pandemic confined at Nevada Southern Detention Center. This alone makes the sentence Mr. Consuegra serves substantially harsher than that of his more culpable co-defendant.

Additionally, unlike Mr. Mares, Mr. Consuegra will not be able to re-join his family whenever he finishes his custodial sentence. Because Mr. Consuegra is not a citizen of this country, he will be immediately deported to Mexico—a country he has not lived in since he was 14 years old.[42] As a result of his removal from this country, Mr. Consuegra will be leaving behind his wife and two young children.

Although his removal from this country and separation from his family is a substantial punishment that only undocumented immigrants face, Mr. Consuegra's treatment by the BOP as a non-citizen will also affect the sentence he serves. Undocumented immigrants are denied the services of citizens in BOP custody and receive no transitional services from the United States Probation Office because they are not actually supervised. The BOP has made noncitizens "ineligible for drug treatment programs and, in most instances, for 'nearer release' transfers, which place prisoners closer to their families; exempted foreign nationals from literacy and math requirements that trigger access to basic education programs; and proposed a rule excluding noncitizens from all postsecondary and occupational education programs

---

[42] PSR ¶¶ 64, 67.

14

before concluding that foreign nationals could participate in such programs, but only if 'resources are available after participation by inmates' without detainers."[43]

Considering the nature and circumstances of the offense, Mr. Consuegra's background and characteristics, and the uniquely harsh conditions under which Mr. Consuegra is serving his sentence, a sentence of 108 months as recommended by United States Probation is a sentence that is far greater than necessary to meet the goals of sentencing and will create a disparity from similarly-situated individuals sentenced within this district.

According to the Interactive Data Analyzer, in the District of Nevada for the last five fiscal years (2017, 2018, 2019, 2020, 2021), for individuals with a Criminal History Category I and who were of convicted of a drug trafficking charge and sentenced under USSG § 2D2.1, the average and median sentence was 47 months and 41 months respectively. These numbers are substantially lower than the recommended sentence in this case.



The figure includes the 113 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2017,2018,2019,2020,2021; Circuit: 9th Circuit; State: All; District: Nevada; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Drug Trafficking; Guideline: §2D1.1; Drug Type: Methamphetamine; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

---

[43] Kaufman, Emma, *Segregation by Citizenship*, 132 Harv. L. Rev. 1379, 1400 (March 2019).

More importantly, sentencing Mr. Consuegra to 108 months when his substantially more culpable co-defendant received a 96-month sentence would result in an unsupported and unfair disparity in this specific case.  Accordingly, in light of the above, a downward variance is warranted.

**C.    A downward variance is also appropriate in this case based on a reasonable policy disagreement over the actual methamphetamine guideline.**

Mr. Consuegra's base offense level began at a level 36 due to the weight and purity of the methamphetamine involved in this case.[44]  The sales involved here amounted to 2,221 grams (or 4.9 pounds) of methamphetamine that was between 95% to 98% pure.[45]  In imposing sentences for drug offenses, courts across the nation are recognizing that weight and purity are not necessarily reasonable indicators of culpability to support a sentence.

In *Kimbrough v. United States*, the Supreme Court found that a sentencing court was justified in varying from the sentencing guidelines based on a finding that the drug guideline, U.S.S.G. § 2D1.1, was derived not from empirical data but based on the "weight-driven scheme" in the Anti-Drug Abuse Act of 1986.[46]  Because the guideline was not developed by the Commission in its characteristic institutional role and lacked empirical support, the Supreme Court found that the sentencing judge did not abuse his discretion by varying from the guideline based on a categorical policy disagreement rather than on individualized considerations.[47]  In the years since *Kimbrough*, a growing number of sentencing courts have granted variances at least in part because the drug-trafficking guideline is not rooted in empirical evidence but is instead tied to the weight-driven Anti-Drug Abuse Act.

---

[44] PSR ¶ 36.

[45] PSR ¶¶ 9, 15.

[46] 552 U.S. 85, 96-97 (2007).

[47] *Id.* at 110.

16

In this district, for example, courts have begun to recognize the arbitrary and overly harsh sentences created by a strict application of the drug guidelines.

| | |
|---|---|
| *United States v. Mario Bojoroquez-Manrique*, 2:19-cr-0153-APG-DJA (D. Nev., Sept. 2020) | Finding "the drug laws do not adequately account for the defendant's culpability" and that the "drug guideline ranges are not empirically based." ECF No. 55 at 16. |
| *United States v. Stephanie George*, 2:20-cr-0009-JAD-VCF (D. Nev., Sept. 2021) | Finding "a downward variance is necessary to ensure that the sentence in this case is based on a thoughtful application of the 3553(a) factors and the defendant's role and conduct instead of an arbitrary Congressional decision that results in a nearly 13-year sentence for relatively small-scale, non-violent drug trafficking." ECF No. 146 at 31. |
| *United States v. Morris Collins*, 2:17-cr-0354-APG-EJY (D. Nev., Oct. 2021) | Finding "the sentencing guidelines are extremely high for drug offenses"; "[t]he ranges themselves are not based on any empirical evidence and frankly bear virtually no relationship, in general, to the facts or the defendant's true culpability; and "a downward variance to a certain degree is necessary to ensure that the sentence in this case is based on a thorough and thoughtful application of the 3553(a) factors instead of just an arbitrary congressional decision." ECF No. 152 at 26. |

Mr. Consuegra respectfully requests this Court similarly exercise its discretion in choosing to vary from the sentencing guidelines based on a reasonable policy disagreement.

### D.    Drug weight and purity are poor proxies for culpability.

Unlike most drugs, the Guidelines quantify methamphetamine based not only on weight but on purity. In determining the base offense level, there is a 10:1 ratio between "actual" methamphetamine—that is, methamphetamine that is at least 80% pure— and methamphetamine mixture, which is everything less. The apparent theory underpinning harsher punishments for higher purity methamphetamine is that purity reflects the offender's

role in the drug-distribution chain.[48]  The commentary to the guideline explains: "Since controlled substances are often diluted when combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."[49]  This theory of culpability finds no empirical support.

The Ninth Circuit has explicitly recognized a sentencing court's authority to vary from the methamphetamine guideline based on a policy disagreement with the purity ratio,[50] and a growing number of judges have recognized that the purity rationale is "divorced from reality."[51]  As Judge Bennett from the Northern District of Iowa explained "because today's methamphetamine is substantially pure, purity is not a proxy for relative culpability."[52] Mexican cartels' increased control over methamphetamine distribution has dramatically increased the national average purity of methamphetamine.[53]  DEA statistics show that the mean national meth purity grew from as low as 38.7% in 2007 to as high as 94% by 2013.[54] A DEA report from 2017 showed that, from 2011 to 2016, "the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in

---

[48] *See* U.S.S.G. 2D1.1 cmt. n. 27(c).
[49] *Id.*
[50] *United States v. Mendoza*, 121 F.3d 510 (9th Cir. 1997).
[51] *United States v. Ibarra-Sandoval*, 265 F. Supp.3d 1249, 1255 (D.N.M. 2017) (Brack, J.) (finding "the average purity of methamphetamine today is over 90 percent. This means that the sentencing Guidelines would treat the average individual convicted of a crime involving methamphetamine as a kingpin or leader, even though that simply is not true").
[52] *See United States v. Nawanna*, 321 F. Supp.3d 943, 951 (N.D. Iowa 2018) (Bennett, J.) (to their credit, the U.S. Attorneys "'largely agreed' with Nawanna's statement of the lack of any empirical basis for the current methamphetamine Guidelines and the 'factual underpinnings' of his argument that there has been a trend in recent years toward much higher purity of methamphetamine at all levels of distribution").
[53] *Ibarra-Sandoval*, 265 F. Supp.3d at 1224.
[54] *Id.* at 1255 (citing Drug Enforcement Agency, 2013 National Level STRIDE Price and Purity Data, at (2015)).

early 2014, and most recently, for the third quarter of 2016, averaged 93.5 percent pure."[55] Then, a 2018 DEA report found that methamphetamine purity remained at record highs.[56] As did the 2020 DEA report, which found that in the first half of 2019, methamphetamine averaged 97.2 percent purity.[57]

Because high-purity methamphetamine is currently available "at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases, not enhanced punishment based on individualized determinations."[58] As a result, judges across the country have rejected the purity ratio and imposed a sentence within the mixture, as opposed to the actual, methamphetamine guideline, even in a mine-run case.[59]

---

[55] *Nawanna*, 321 F. Supp.3d at 951 (citing Drug Enforcement Agency, 2017 National Drug Threat Assessment at 70 (2017)).

[56] *See* Drug Enforcement Agency, 2018 National Drug Threat Assessment , at 60–1 (2018), https://www.dea.gov/sites/default/files/2018-11/DIR-032-18%202018%20NDTA%20final%20low%20resolution.pdf.

[57] *See* Drug Enforcement Agency, 2020 National Drug Threat Assessment, at 19-20 (2020),https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

[58] *Nawanna*, 321 F.Supp.3d at 954.

[59] *See, e.g.*, *United States v. Pereda*, 2019 WL 463027 (D. Colo. 2019) (Arguello, J.); *United States v. Carrillo*, 440 F.Supp.3d 1148, 1154-5 (E.D. Ca. 2020) (addressing the purity issue by assigning the base offense level for methamphetamine mixture); *United States v. Harry*, 313 F. Supp.3d 969, 974 (N.D. Iowa 2018) (Strand, C.J.) (rejecting the actual and ice methamphetamine guidelines because "drug purity is not an accurate proxy for culpability" and the "10-to-1 ratio established in the Guidelines is not based on empirical evidence") *United States v. Ferguson*, 2018 WL 3682509, at *1 (D. Minn. Aug. 2, 2018) (Tunheim, C.J.) (supporting downward variance with the finding that "methamphetamine purity is no longer a proxy for, and thus not probative of, the defendant's role or position in the chain of distribution"); *Ibarra-Sandoval*, 265 F. Supp.3d at 1252 (D.N.M. 2017); *United States v. Jennings*, 2017 WL 2609038, at *2–4 (D. Idaho Jun. 15, 2017) (Winmill, C.J.); *United States v. Ortega*, 2010 WL 1994870, at *4–7 (D. Neb. May 17, 2010) (Betaillon, C.J.).

The presence of high-purity methamphetamine effectively guarantees that a defendant's base offense level will substantially increase—if the methamphetamine is tested for purity. Because the decision whether to test the drugs is arbitrary, a number of courts have also declined to impose the purity ratio on that additional basis.[60] As these courts have explained, factors contributing to arbitrary purity testing include: authorities seizing only some of the drugs, limiting the sample available for testing; labs being too busy to complete testing before sentencing; defendants pleading guilty to avoid purity testing; and prosecution originating with a state agency rather than a federal one.[61]

In addition to the above issues surrounding drug purity and a defendant's knowledge, sentencing courts have also increasingly recognized that "drug quantity is a poor proxy for culpability."[62] As a federal judge in Alabama recently and colorfully explained "it is the Pablo Escobars, Stringer Bells, Tony Montanas, and Walter Whites of the world who bear the greatest culpability, not the street peddlers, middlemen, and mules, regardless of the quantity of drugs that happens to be involved in the crimes for which they are convicted."[63]

---

[60] *United States v. Boyd,* 437 F.Supp.3d 830, 833 (D. Idaho 2020) (C.J. Winmill) (The reasons why testing is or is not performed in any case are completely arbitrary and lead to sentencing disparity among similarly situated defendants); *Pereda*, 2019 WL 463027, at *5; *Ferguson*, 2018 WL 3682509, at *4; *Nawanna*, 321 F.Supp.3d at 948; *Ibarra-Sandoval*, 265 F.Supp.3d at 1256; *Jennings*, 2018 WL 2609038, at *4; *Ortega*, 2019 WL 1994870, at *4–7;

[61] *Boyd,* 473 F.Supp.3d at 833.

[62] *See, e.g.*, *United States v. Diaz*, 2013 WL 3222243 (E.D.N.Y. Jan 28, 2013) (expressing policy disagreement with the Guidelines for heroin, cocaine, and crack offenses and reducing Guidelines range by one-third); *United States v. Nincehelser*, 2009 WL 872441 (D. Neb. Mar. 30, 2009) (sentencing below the Guideline because "the drug offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise" an concluding that the quantity-based approach is "not always a trustworthy measure of the culpability of an individual defendant"); *United States v. Cabrera*, 567 F. Supp.2d 271 (D. Mass. 2008) (varying downward and rejecting the cocaine guideline on the basis of "the over-emphasis on quantity and the under-emphasis on role in the offense" and reducing guideline range by one-third).

[63] *United States v. Johnson*, 379 F. Supp.3d 1213, 1221 (M.D. Ala. 2019).

1    In this case, applying a strictly guidelines sentence unreasonably focuses on the weight

2  and the purity of the methamphetamine and fails to take into consideration the unique

3  circumstances of Mr. Consuegra's case as outlined above.  Treating Mr. Consuegra in-line

4  with his role rather than the drug weight and purity will adequately deter criminal conduct and

5  promote respect for the law and is particularly appropriate given his limited participation, the

6  circumstances surrounding this offense, and his lack of any criminal history.

7  **III.    CONCLUSION**

8    For the foregoing reasons, Mr. Consuegra respectfully requests this Court sentence

9  him to credit for time served, which amounts to 34 months in federal custody.

10    DATED this 7th day of December 2022.

11                                             RENE L. VALLADARES
                                               Federal Public Defender
12

13                                   By:    */s/ Katherine Tanaka*
                                       _____
14                                         KATHERINE TANAKA
                                           Assistant Federal Public Defender
15                                         Attorney for Renato Consuegra-Clemente

16

17

18

19

20

21

22

23

24

25

26

1

## CERTIFICATE OF ELECTRONIC SERVICE

2          The undersigned hereby certifies that she is an employee of the Federal Public Defender

3    for the District of Nevada and is a person of such age and discretion as to be competent to serve

4    papers.

5          That on December 7, 2022, she served an electronic copy of the above and foregoing

6    Sentencing Memorandum and Formal Objections to the Presentence Report by electronic

7    service (ECF) to the person named below:

8

9          JASON FRIERSON
           United States Attorney
10         ALLISON REESE
           Assistant United States Attorney
11         501 Las Vegas Blvd. South
           Suite 1100
12         Las Vegas, NV 89101

13                                    /s/ Katherine Tanaka
                                      Employee of the Federal Public Defender
14

15

16

17

18

19

20

21

22

23

24

25

26