JASON M. FRIERSON
United States Attorney
District of Nevada
Nevada Bar Number 7709
ALLISON REESE
Nevada Bar Number 13977
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Email: allison.reese@usdoj.gov
*Attorneys for the United States of America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RENATO CONSUEGRA-CLEMENTE,<br><br>Defendant. | Case No.: 2:20-cr-00018-JCM-EJY<br><br>**Government's Response to Defendant's Sentencing Memorandum and Formal Objections to the Presentence Report [ECF No. 110]** |

Certification: This response is timely filed.

### I.   Introduction

The Defendant Renato Consuegra-Clemente conspired with his co-defendant brother-in-law Francisco Javier Mares and others to distribute methamphetamine to the Las Vegas community. In furtherance of the conspiracy, the Defendant brokered and sold approximately five pounds of actual methamphetamine to a DEA confidential source on two occasions. He has pled guilty to this conduct and will come before the Court to be sentenced on December 14, 2022. At that time, the government will respectfully request this Court to sentence the Defendant to 108 months followed by five years of supervised release, which is consistent with the recommendation of the United States Probation Office.

1

## II. Argument

### a. Term of Imprisonment

The goal of sentencing is to "'impose a sentence sufficient but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed . . . correctional treatment."[1] In fashioning a sentence, the Court considers the "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need for the sentence imposed," "the kinds of sentences available," the applicable sentencing guideline range, any pertinent policy statement, sentences imposed on other similarly situated defendants, and the need for victim restitution.[2]

Here, the government respectfully requests that the Court sentence the Defendant to 108 months imprisonment, which is the low end of the sentencing guideline range. The government believes that a 108-month custodial sentence is appropriate in this case in light of the factors contained in 18 U.S.C. § 3553(a) in order to protect the public, to reflect the seriousness of this offense, and to avoid unwarranted sentencing disparities. Moreover, in coming to this recommended sentence the government took the Defendant's history and other proffered mitigation into consideration, as required by Title 18, United States Code, Section 3553.

   *i.* *The facts of the instant offense warrant a 108-month sentence.*

The facts of the instant offenses and the Defendant's role therein support the government's recommendation. In September 2019, the DEA began investigating the Defendant because a confidential source ("CS") identified him as a Las Vegas based distributer

---

[1] *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)).
[2] *See* 18 U.S.C. § 3553(a).

2

of methamphetamine.[3] The CS then communicated directly with the Defendant to arrange the sale of one pound of methamphetamine on October 23, 2019 for $1,700. But, because the Defendant had to work when the deal was supposed to happen, he sent his co-defendant brother-in-law to meet with the CS and deliver the methamphetamine, which was 98% pure.[4] Following that transaction, the Defendant again coordinated with the CS to arrange a second sale of three pounds of methamphetamine on October 29, 2019.[5] This time, the Defendant did not have a scheduling conflict and was available to personally sell the methamphetamine to the CS with his co-defendant.

On October 29, 2019, the Defendant drove to the meet location and met with his co-defendant brother-in-law and the CS.[6] The Defendant then spoke with the CS about his source of supply. The Defendant told the CS that the source of supply was a father and son, that they lived far away, and that they wanted the CS to purchase much larger quantities of methamphetamine in the future.[7] The Defendant encouraged the CS to purchase larger quantities from Defendant so that he could make more money.[8] The Defendant also asked the CS to accompany him in the future to meet the Defendant's source of supply.[9] Eventually, the Defendant told the CS that he had four pounds of methamphetamine that day, instead of the three pounds originally requested. Ultimately, at the direction of the DEA, the CS agreed to

---

[3] PSR ¶ 5.
[4] PSR ¶¶ 6-9.
[5] PSR ¶ 12.
[6] PSR ¶ 13.
[7] *Id.*
[8] *Id.*
[9] PSR ¶ 14.

1  take all four pounds of methamphetamine and would pay the Defendant for the fourth pound
2  the next day.[10] This methamphetamine was later tested and returned as 95% pure.[11]
3      The next day, the Defendant, this time unaccompanied, and the CS met so that the CS
4  could pay the Defendant for the outstanding $1,600 for the methamphetamine.[12] The
5  Defendant and the CS then conversed about future narcotics transactions between them,
6  including a discussion about the quantity and the price per pound.[13] The Defendant explained
7  how the CS could purchase more methamphetamine from the Defendant, specifically, 50
8  pounds of methamphetamine, and that his source of supply lived in California, and that the
9  Defendant could also sell the CS cocaine and heroin.[14] The conversation then continued into a
10 discussion regarding the sale of AR-15 rifles. The Defendant told the CS that he was interested
11 in purchasing as many AR-15 rifles as possible because he believed his source of supply would
12 buy them.[15] The two then departed in their respective vehicles.[16]
13     Yet despite this serious conduct and the Defendant's integral and direct role in the
14 success of the conspiracy by conducting the drug transactions, he asks the Court to impose an
15 11-level downward variance and sentence him to time served, which is approximately 34
16 months. To justify the departure, the Defendant first tries to distinguish himself from his co-
17 defendant by arguing that the Defendant played a *minor role* in the conspiracy. Nothing could
18 be further from the truth and granting such a departure would be contrary to the law. The Court
19 should therefore deny the Defendant's requested variance.

---

[10] *Id.*
[11] PSR ¶ 15.
[12] PSR ¶ 16.
[13] PSR ¶ 18.
[14] PSR ¶¶ 18. *See also* PSR ¶ 22.
[15] PSR ¶¶ 20. *See also* PSR ¶ 22
[16] PSR ¶ 21.

United Stated Sentencing Guidelines Section 3B1.2, a defendant is entitled to a minor role adjustment if he was "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."[17] This culpability determination is heavily fact dependent[18] and courts are instructed to consider the following non-exhaustive list of factors:

    (i)    The degree to which the defendant understood the scope and structure of the criminal activity;

    (ii)    The degree to which the defendant participated in planning or organizing the criminal activity;

    (iii)    The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

    (iv)    The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

    (v)    The degree to which the defendant stood to benefit from the criminal activity.[19]

Here, all of the factors weigh against the application of the minor role adjustment. The Defendant acknowledges that he was the "facilitator" in this conspiracy.[20] But under his theory, the Defendant claims that he merely brokered the deals between the CS and his co-defendant and did not exhibit any other authority over the methamphetamine or the money or responsibility for the transactions. Rather, the Defendant argues that his co-defendant was substantially more culpable because he brought the drugs to the transactions.[21] Even if the Court accepted the Defendant's claims as true—which they are not— he would still not qualify for a downward role adjustment. For instance, in *United States v. Awad*,[22] the Ninth Circuit

---

[17] USSG § 3B1.2, Application Note 5.
[18] *Id.*, at Application Note 3(C); *United States v. Williams,* 898 F.2d 1400, 1403 (9th Cir. 1990).
[19] USSG § 3B1.2, Application Note 3(C).
[20] *See* ECF No. 110, pg. 4.
[21] *Id.*
[22] 371 F.3d 583, 591 (9th Cir. 2004).

5

rejected this very same argument and held that the defendant did not qualify for either the minimal nor minor role adjustment because there was evidence that the defendant actually brokered and facilitated the drug deal. Facilitation of the charged sales in and of itself is an essential component[23] of the conspiracy because "but for" the Defendant's role, these sales would not have occurred.

The Defendant misrepresents and minimizes his actual role and knowledge of the conspiracy. The Defendant had extensive and detailed information regarding his source of supply: (1) who they were, (2) where they lived, (3) what drugs they sold, (4) how much they charged for their drugs, and (5) their interest in purchasing firearms.[24] The Defendant was also personally negotiating the sale price for the methamphetamine with the CS as well as future deals—something neither his charged co-defendant nor the source of supply did. The Defendant tries to mischaracterize the government's arguments in support of his co-defendant's sentencing to suggest that because the Defendant did not personally bring the drugs to the sales, he played a minor role.[25] Not so. The Defendant exhibited authority over his co-defendant brother-in-law by directing him to meet with and complete the transaction with the CS in his absence during the first transaction, and also directing him to obtain the four additional pounds of methamphetamine for the second transaction. Notably, the Defendant was present for the second and larger transaction that involved additional negotiations because the Defendant wanted to sell more methamphetamine than what was originally negotiated. And the

---

[23] *See United States v. Almazan-Becerra*, 482 F.3d 1085 (9th Cir. 2007) (the fact that other conspirators were more involved did not entitle the defendant to the role reduction).
[24] *See* PSR at ¶¶ 13-14, 18, 20, 22
[25] For instance, the Defendant argues that "the record shows that Mr. Mares had a long-established relationship with the source of supply…" ECF NO. 110, pg. 12. But what the government argued was that this conduct was *indicative* of such a relationship. The record establishes that both defendants had a relationship with the source of supply here regardless of who actually brought the drugs to the sales.

6

Defendant personally met with the CS the next day to collect the proceeds from that sale. Moreover, the Defendant benefited from these sales and this conspiracy. Not only did he accept money directly, the Defendant also encouraged the CS to buy much larger quantities so that he could make more money and sell him guns so that he could sell them to his source.[26]

Characterizing this conduct as "substantially less" than that of the co-defendant brother-in-law is simply not supported by the law or the facts. The Court should therefore reject the Defendant's request for a minor role adjustment and instead sentence the Defendant to 108 months, which is the low end of the advisory guideline range.

    ii.    *The Court should not discard the sentencing guidelines as calculated.*

The Court should not discard the recommended Guideline based on a policy disagreement because, although they were deemed "advisory," the Supreme Court has maintained that they should nonetheless maintain a "key role" and "starting point" in sentencing. While the Supreme Court deemed "the Guidelines system advisory,"[27] in *Kimbrough v. United States*, the Supreme Court emphasized that there was still a "key role for the sentencing commission."[28] The Supreme Court held that the Commission "fills an important institutional role...[i]t has the capacity courts lack to 'base its determinations on empirical data and national experience....'"[29] Because of this, "district courts must treat the Guidelines as the 'starting point and the initial benchmark.'"[30]

When district courts are making a sentence determination, the Guidelines are "not the only consideration."[31] The judge "should consider all of 18 U.S.C. § 3553(a)'s factors" and

---

[26] PSR ¶ 13.
[27] *United States v. Booker*, 543 U.S. 220, 246 (2005).
[28] 552 U.S. 85, 89 (2007).
[29] *Id.*
[30] *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).
[31] *Gall*, 552 U.S. at 39.

7

"must make an individualized assessment based on the facts presented."[32] This principle strikes a balance between the Sentencing Commission's "important institutional role" and "expertise," and the sentencing judge's "greater familiarity with...the individual case and the individual defendant...."[33] While this may appear as a seemingly flexible standard, the Supreme Court cautioned that a "*significant justification*" is required when district courts choose to deviate from the Sentencing Guidelines.[34] If the district court "decides that an outside-Guidelines sentence is warranted, he must...ensure that the justification is sufficiently compelling to support the degree of variance."[35]

In the present case, no such justification exists to depart from the Sentencing Guidelines.[36] This specific case does not fall outside the "heartland to which the Commission intends the individual Guidelines to apply."[37] The Defendant pled guilty to Conspiracy to Distribute a Controlled Substance, with a factual basis including 2,221 grams of actual methamphetamine.[38] This large amount was exactly what both Congress and the Sentencing Commission intended to punish when the Guidelines were enacted. And departing from the guidelines here would cause unwarranted sentencing disparities.

Moreover, over the last three decades, Congress has consistently increased penalties for methamphetamine distribution.[39] Beginning in 1988, Congress passed the Anti-Drug Abuse Act of 1988, which established a mandatory minimum of five years for possession of 100 grams

---

[32] *Id.* at 50.
[33] *Kimbrough*, 552 U.S. at 108–09.
[34] *Id.* (emphasis added).
[35] *Id.*
[36] PSR ¶¶ 109-110.
[37] *Kimbrough*, 552 U.S. at 109.
[38] PSR ¶ 28.
[39] *See* Amy Baron-Evans, *Promulgation and Amendment of U.S.S.G. § 2D1.1, Methamphetamine Offenses 1988-2012.*

mixture or 10 grams of pure methamphetamine, and a ten-year minimum for 1 kilogram mixture or 100 grams pure methamphetamine.[40] Just two years later, under the Crime Control Act of 1990, Congress amended the guidelines to include the smokable crystal form of meth, "Ice," and chose to punish this form of methamphetamine two levels above other forms.[41]

In 1995, Congress decided to "delete[] the distinction between...methamphetamine in the Drug Equivalency Tables," and emphasized that the "weak form of methamphetamine...is never made intentionally, but rather results from a botched attempt...."[42]

In 1996, Congress passed the Comprehensive Methamphetamine Control Act of 1996. This Act decreased the requisite quantity for a methamphetamine mixture to 50 grams for five years, and 500 grams for ten years. Congress listed four reasons for the decreased quantities:

> (1) the rapidly growing incidence of methamphetamine abuse and the threat to public safety such abuse poses;
> (2) the high risk of methamphetamine addiction;
> (3) the increased risk of violence associated with methamphetamine trafficking and abuse; and
> (4) the recent increase in the illegal importation of methamphetamine and precursor chemicals.[43]

Further, in 1998, Congress continued to enact harsher penalties on methamphetamine use by passing the Methamphetamine Trafficking Penalty Enhancement Act of 1998. This Act cut in half the quantities of pure methamphetamine which triggered the mandatory minimums.[44] Then, in 2000, Congress amended the Guidelines to include sentencing level increases for methamphetamine offenses which created a "substantial risk of harm" to minors

---

[40] Anti-Drug Abuse Act of 1988, 21 U.S.C. 1501 § 6470(g) (1988).
[41] Crime Control Act of 1990, 31 U.S.C. 5311 § 2701 (1990).
[42] U.S.S.G. § 2D1.1 (amend. No. 518).
[43] Comprehensive Methamphetamine Control Act of 1996, 21 U.S.C. 801 § 301(a).
[44] Methamphetamine Trafficking Penalty Act of 1998, 21 U.S.C. 801, div. E, sec. 2.

9

or incompetents.⁴⁵ In 2010, Congress passed the Fair Sentencing Act of 2010, which added a 2-level enhancement for methamphetamine charges if the defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance."⁴⁶

Most recently, the Methamphetamine Response Act of 2021 was introduced and passed in the senate on December 14, 2021. Though it has not become law, the purpose of the bill is to "designate[] methamphetamine as an emerging drug threat" and to direct the Office of National Drug Control Policy to implement a response plan.

It is clear that Congress has consistently demonstrated that it has sought to *increase* punishments for the distribution of methamphetamine and show its concern for the threat that methamphetamine poses across the United States. Congress has: (1) decreased quantity amounts that trigger mandatory minimums, (2) increased penalties for the manufacturing and distribution of methamphetamine which harms children, and (3) has continually emphasized the harms that methamphetamine abuse and addiction poses. And, while Congress has decreased punishments for other controlled substances, Congress has never decreased punishments for distribution of methamphetamine; Congress has only increased punishments for distribution of methamphetamine. Because Congress's clear intent has been to punish methamphetamine more severely, this Court should be much more inclined to follow Congress' intent through implementation of the Guidelines and be much less inclined to downward vary from them.

Simply put, distribution of methamphetamine—especially methamphetamine that is 95% and 98% pure—and other illegal narcotics, pose a significant cost and danger to the community because of the widespread ruinous effects that these narcotics have on the users,

---

⁴⁵ Children's Health Act of 2000, 42 U.S.C. 201 § 3612.
⁴⁶ Fair Sentencing Act of 2010, 21 U.S.C. 801, § 6.

their families, and the community in general. Methamphetamine is one of the most devastating and addictive drugs on the street. More than 6.1% of methamphetamine users in the United States require medical attention after use.[47] That is more than the combined sum of those who use synthetic cannabis and alcohol.[48] The drugs the Defendant possessed and intended to distribute would have affected thousands of people in this community including not only the users themselves, but their immediate family, including their children, and friends. By conspiring to distribute methamphetamine, the Defendant agreed to take part in a system that furthers addiction, drug overdoses, instances of mental health crises, and accidental deaths. For instance, in the year 2020, over 93,000 people died of drug overdoses, which is a significant increase.[49] And the amount of drug overdose deaths hit the highest level on record in 2021.[50] Also, the sale of narcotics funds criminal organizations, which then leads to increased crime and violence in local communities. The severity of the Defendant's conduct is deserving of a significant sentence of 108 months.

    a. **Supervised Release**

In terms of supervised release, the government concurs with the recommendation of USPO that the Defendant be subjected to a five-year term of supervised release. In addition to keeping the community safe, supervised release helps to rehabilitate the Defendant by providing tools needed to become a productive member of society. The government submits that any likelihood that the Defendant has to re-offend will be significantly reduced if he

---

[47] https://online.maryville.edu/blog/global-drug-survey-reveals-methamphetamine-to-be-the-most-dangerous-drug/ (Last accessed 12/9/2022)
[48] *Id.*
[49] https://www.washingtonpost.com/health/2021/07/14/drug-overdoses-pandemic-2020/ (Last accessed on 12/9/2022)
[50] https://www.cnn.com/2022/05/11/health/drug-overdose-deaths-record-high-2021/index.html (Las accessed on 12/9/2022).

remains accountable under supervision. The government also agrees with the recommended conditions of supervised release. The recommended conditions are reasonably related to the goal of deterrence, protection of the public, rehabilitation of the Defendant, and involve no greater deprivation of liberty than is reasonably necessary for purposes of supervised release.[51]

### III.   Conclusion

The government respectfully requests that this Honorable Court impose a sentence of 108-months imprisonment, followed by a five-year term of supervised release.

DATED:  December 9, 2022

Respectfully submitted,

JASON M. FRIERSON
United States Attorney

 /s/  Allison Reese
_____
ALLISON REESE
Assistant United States Attorney

---

[51] To date, the Defendant has not objected to any of the recommended conditions of supervised release.